UNITED STATES v. LEE. See Case No. 922.

## Case No. 15,589.

UNITED STATES ex rel. THOMPSON v. LEE COUNTY.

[2 Biss. 77;[1] 1 Chi. Leg. News. 121; 9 Int. Rev. Rec. 25; 2 Balt Law Trans. 378.]

Circuit Court, N. D. Illinois. Jan., 1869.

CONFLICT OF JURISDICTION — FEDERAL COURTS — REMOVAL OF CAUSES—MANDAMUS—COUNTY BONDS.

1. To a writ of mandamus issuing from this court it is not a sufficient answer that the respondents had been enjoined by a state court from doing the act which the writ of mandamus commanded.

2. Federal courts supreme, when acting within their sphere, and wherever they come in conflict with the state courts, the latter must give way.

3. Where county bonds had been sold upon the faith of decisions of the supreme court of the state declaring their validity, the fact that the court afterwards reversed its decision does not invalidate those previously purchased in good faith and before maturity.

4. State courts have not the right to interfere with the process of this court to collect judgments therein rendered on such bonds.

5. Where the United States circuit court and the supreme court of the state have ruled differently upon the same questions, and the supreme court of the United States has sustained the circuit court. neither the state courts of that state nor litigating parties can disregard the mandate of the circuit court.

6. A writ of mandamus is the proper process against a board of supervisors, to compel the levy of a tax and payment of a judgment obtained against the county, in this court.

7. Where the respondents make no return to the writ, or refuse to obey it, this court will issue an attachment.

8. Where a suit in the United States circuit court has been removed to the circuit court in another circuit, the latter court has the same power over the parties which the first court would have otherwise had.

---

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

Motion for an attachment [by the United States, on the relation of J. Edgar Thompson] against the members of the board of supervisors of Lee county, Iowa, for contempt in disobeying a writ of mandamus from this court.

Grant & Smith, for relator.

J. C. Hall and Frank Sample, for respondents.

DRUMMOND, District Judge. The facts are these: The county of Lee, Iowa, in pursuance of a statute of that state, and a vote of the people of the county to that effect, issued coupon bonds in aid of the construction of certain railways. A question was made in the courts of Iowa as to the authority of counties under the law to issue such bonds, and it was held by the highest court of the state, in several cases, that such authority existed. These bonds, therefore, had the popular, the legislative and the judicial sanction. The bonds thus fortified, being delivered to the railway companies, were sold in the market, and the relator, among others. became, in the ordinary course of business, a purchaser for value before maturity.

Some of the coupons on bonds held by the relator not being paid, suit was brought thereon in the circuit court of the United States for the district of Iowa. Under the law of congress these suits were transferred to this district, and at the October term, 1864, of this court, the relator recovered three several judgments against the county of Lee, amounting in the aggregate to $8,764.09 and costs. These judgments were unpaid, for the reason, as alleged, that there was no property on which an ordinary execution could operate. In the meantime the supreme court of Iowa had reversed its rulings, and had held all these county bonds invalid. as issued without authority of law. And the statutes of Iowa having provided that a tax should be levied by the board of supervisors, to pay these bonds and interest. injunctions were issued against these defendants, among others, restraining the levy of such tax. The effect of the overruling of their prior decisions by the supreme court of Iowa upon bonds issued and purchased on the faith of the original position taken, has repeatedly come before the supreme court of the United States, and it has been uniformly held by that court that bonds in the hands of a bona fide holder, purchased for value before maturity, while the courts of Iowa sustained their validity, were a just claim against the parties issuing them. It has always seemed to me that this doctrine rested upon the plainest principles of right and equity. The bonds were in market, for sale, decided to be good and effectual in law, by every authority that could speak in the state; the money was paid and received. It would be difficult to imagine a contract made under more solemn and binding guarantees.

The effect of an injunction issued by the tribunals of Iowa prohibiting the levy of a tax, has also several times recently been before the supreme court of the United States, and it has been decided that they cannot, by injunction or otherwise, interfere, in any way, with the appropriate process of the federal courts for the collection of judgments. And in cases like that we are now considering, it is also settled that a mandamus is such process.

Such being the state of the case, on the 10th of July, 1868, the relator obtained an alternative writ of mandamus from this court, requiring the board of supervisors of Lee county to levy a tax to pay off the three judgments and costs recovered by him, or to show cause, on the first Monday of October next thereafter, why they did not make such levy. This writ was duly served on the supervisors by the marshal of Iowa, in the month of September. No cause was shown or apparent notice taken of this writ by the board of supervisors, and their default was entered on the 14th of October. On the 29th of October, 1868, the relator obtained from this court a peremptory writ of mandamus against the supervisors of Lee county, it having been shown that the levy had not been made, requiring them to forthwith impose and to collect without delay the tax for the payment of the judgments, and in this they were "to fail not, under the peril of the law." On the 10th of November last the marshal duly served the peremptory writ of mandamus on the president of the board, and gave a true copy of the same to each member while the board was in open session. No return has ever been made by the defendants to this writ. On the same day that the writ was served, the board, as appears by the published minutes of their proceedings, on the suggestion "of counsel for Lee county in railroad bond suits," adopted the following preamble and resolutions: "Whereas, a peremptory writ of mandamus, issued by the circuit court of the United States for the Northern district of Illinois, sitting at Chicago, in the case of the United States ex rel. J. Edgar Thompson against Lee county, has this day been served upon the members of this board, commanding the levy of taxes for the payment of a certain judgment in favor of said Thompson and against Lee county, rendered upon certain bonds issued by said county to aid in the construction of a certain railroad; and whereas, this board has been heretofore perpetually enjoined by the supreme court of Iowa from levying any taxes for the payment of any of said bonds, and the said injunction was in force and duly served upon this board before the said mandamus was applied for or issued: Resolved, that we believe our oaths require us to obey the said injunction, issued by the supreme court of Iowa, and duly served as aforesaid. Resolved, that we are therefore unable to comply with the order contained in said writ of mandamus without violating the constitution or laws of Iowa as construed by the courts of Iowa, and also doing violence to our oaths of office as we understand it, and rendering ourselves liable to punishment for contempt and violation of our sworn duty. Resolved, that we earnestly desire to obey all orders of the courts of our country, and do not wish to be in contempt of any, but, situated as we are, we are compelled to obey said injunction and decline to levy said tax, and to rely upon the justice of our government and the courts, both state and federal, for protection."

The sixteen members who appear to have been present that day, and who, it will be borne in mind, were parties to this suit, and had been served with process, all save one—and I name him to his honor, B. S. Merriam—voted for the resolutions. The presiding officer, apparently not being required by the rules in such case to vote, did not vote.

I have given the whole of the preamble and resolutions in order that the defendants may have the benefit of their entire justification; and the substance of it all is this, viz.: that in a matter where they, as citizens of Iowa and the United States, are to decide whether they will submit to the authority of the courts of that state or to the nation, they will yield obedience to the commands of the courts of Iowa, and disregard those of the United States. And they adopted this course after it had been decided by the highest court of the nation, in a similar case, that it was against law, and upon the suggestion of counsel who must at the time have known that the supreme court of the United States had so decided. It was supposed that the dogma contained in the resolutions just cited was exploded by the issue of the late Rebellion. But it seems hydra-headed, and we now encounter it within the borders of the patriotic state of Iowa, which struggled as hard as any other state to extirpate it. It would seem to need no argument to show that the position taken by the board of supervisors of Lee county is unsound. If tenable, then the federal courts are enchained by state authority, and cannot execute their own decrees. They act within the states and upon the people of the states. That is the very law of their being. But it is a fundamental principle that within their sphere they are supreme. Whether or not they are in the path pointed out by the constitution and law depends, by the very terms of the instrument itself, upon the adjudications of the supreme court of the United States. Then, when that court, in a given case, has decided that the parties should obey the mandate of a federal court, state courts must yield. This has been the rule from the foundation of the government, and, therefore, in certain controversies writs of error issue to the highest court of a state to revise its judgment or decree, under the twenty-fifth section of the judiciary act of

1789 [1 Stat. 85]. It is upon the same principle that the act of March 2, 1833 (4 Stat. 634), was passed at the time of the South Carolina troubles. The courts of the United States have constantly followed it since their organization. To take a very recent example: The bankrupt law of 1867, in various ways, interferes with the proceedings of the state courts. By what right? By virtue of the power in congress "to establish uniform laws on the subject of bankruptcy." Whenever, in carrying out this power, the courts of the United States act upon the courts of the states, the latter must give way, and for the simple reason that the authority of the former is paramount. It must be so under our system, for it is very clear, if the doctrine now sought to be maintained by the defendants prevailed generally, the tie that binds the states, in the administration of justice at least, would be severed at once. What, therefore, the defendants are required to do in this case is nothing new. State courts and judges have done it often, and because they believed their oaths of office required it under the sixth article of the constitution, which declares that the laws of the United States "made in pursuance thereof * * * shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

The mandate issued from this court is a law to these defendants, expressly decided so by the supreme court of the United States. The judges of Iowa are bound to obey and respect it. On what higher ground can the board of supervisors of Lee county, in that state, place themselves to escape its binding obligation? It is the undoubted right of the courts of Iowa, in suits therein, to decide all legal questions properly coming before them under the constitution and laws of that state, and the parties thereto are concluded by such decision; but when they decide differently, in different cases, upon the same point, and the supreme court of the United States has adopted one course of decisions and rejected the other, neither the courts of that state nor the parties to controversies in the courts of the United States, can ignore or disregard the judgments of the federal courts, merely because they suppose the right ruling has not been followed. It has sometimes happened that the supreme court of the United States has overruled its own previous decision, made in accordance with the judgment of a state court, in order to follow the guide there set up, but it is obvious that there must be a limit to such deviations, and that court has frequently failed to see sufficient reason for the change. These cases from Iowa furnish one instance where it has refused to adopt the last decision of a state court. It is true there was not complete harmony of opinion among the judges of the supreme court of Iowa, nor has there been among the judges of the supreme court of the United States, upon the question in controversy between these parties, but that is not uncommon. It is a difference of opinion upon the law among lawyers and even judges that gives rise to most if not all of the litigation in our courts. Courts are created to settle these differences and adjudicate on the rights of parties. Many of the rules now of daily practice in the courts of the United States have been established, not by a unanimous court; of which much of the jurisdiction in admiralty is an example. It is a maxim of the law that the public interest demands there should be an end of legal controversy, and, therefore, when the decision of a competent court of final resort in a case within its jurisdiction is given, as to that, the door is closed.

I infer from an opinion which has just been published of the supreme court of Iowa, and which I suppose to be authentic, the judges of that court intend to adhere to its later rulings on the validity of these county bonds. No one can question their right to do so, but it seems to me no intimation even should be given from which it could be inferred that in a conflict in such a case, between the courts of the state and of the United States, the decisions of the state court are paramount. It is clear that is the view taken of the subject by the defendants, and, it would seem, inspired by counsel and not discouraged by judges. It is inconceivable that these defendants could have taken their course without some reason for believing that they would be sustained. Indeed, they distinctly say, situated as they are, they rely upon the courts of the state, as well as of the nation, for support. It is difficult to comprehend by what mode of reasoning they reached the conclusion they could rely upon a federal court for protection against the consequences of their own disobedience of its orders; for a court that cannot and will not enforce its decree is shorn of one of its principal attributes. The judgments of the relator would become valueless without the means of compelling payment, and when he asks for any appropriate and legal process to effect that result, the court ought not to withhold it. If there had been any steps taken to remove the case to the supreme court of the United States, to the end that questions of so much doubt, and about which there has been so great a difference of opinion at the bar and on the bench, might be re-examined, then, perhaps, there would be some grounds for declining to act. But nothing of the kind has been attempted. The parties have contested, unsuccessfully, all these points so often before the courts of the United States, that they have abandoned further controversy in argument, and now hope to interpose as a shield the order of a state court. As has been seen, such order is of no avail, and the

hope, to every one who can examine the subject unaffected by feeling, must appear to be founded on a mere fallacy. Other cases, similar to these now under consideration, were transferred from Iowa to this state some years since, because of the alleged interest of the judges of the circuit court of the United States for that district in the questions involved, and thus this court has been connected with the untoward controversy which has arisen between the courts of the United States and of that state, and in which at that time, in order to execute the judgments rendered, the judges of this court were called on to issue a peremptory writ of mandamus to parties under injunction from the state court, and though admitting it was an appropriate process, they, under the circumstances, were unwilling to do anything to produce a conflict, and therefore declined to issue the writ; requesting the parties, in the first place, to go before the courts of Iowa and apply for a removal of an apparent obstacle to the process of this court. But that was not done, or if it were, the application was unsuccessful, and the supreme court of the United States has since decided, as has been shown, that the obstacle was not a real one, and that the process should issue and be executed. Upon what principle is it that the judges of this court, administering in these cases under the constitution of the United States the laws of Iowa, must obey the mandates of the supreme court, and the defendants, parties in the very cases where the mandates issue, must not obey them? It would be difficult by any train of reasoning within the scope of ordinary intelligence to name it.

The question has occurred whether before a writ of attachment is ordered a rule to show cause should be served on the defendants. If it did not clearly appear that the defendants had deliberately taken their line and resolved to abide the results of a violation of the orders of the court, that course would be adopted But it is plain from what has been stated that the only cause has already been shown. And it would seem, therefore, that a rule to show cause would serve no useful purpose. The object is to oblige the defendants to obey a lawful order of this court, and if they will do that, there is no desire to impose mere penalty. And besides, as parties to a suit in this court, on their own showing, they are guilty of contumacy. They allege, indeed, that they desire to obey all orders of the courts of the country, and do not wish to be in contempt of any, but an open, willful, deliberate violation of a lawful order of a court, duly served on a suitor, is itself a contempt, and, therefore, while they disclaim the wish to be in contempt, they expressly admit they have committed it. It has been hinted that the officer may be resisted in the service of the attachment, in this case; but though there does not seem to have been that complete acquiescence in the judgments of the federal courts expected by the supreme court of the United States, yet it is to be hoped all such apprehensions are groundless, for under the law of congress this court has precisely the same power over the parties in Iowa as the circuit court of that district would have had if the cases had not been transferred. I am not insensible of the gravity of this case, and have stated, somewhat at length, the reasons upon which the action of the court is based, and with the hope that the defendants may reconsider the circumstances of their position and act in conformity with law. The principles presented are established by the highest judicial authority in the country, and indeed are familiar. [For when it is once settled, as it has been by many decisions, and in these Iowa cases, among others, that mandamus in such a case as this is a lawful process of this court, then it comes within a rule that would seem to be without exception, viz. that no state court can obstruct or interfere with it.] [2] They have been thus referred to because they seem to be either unknown, forgotten, or repudiated by the defendants and their legal advisors.

In granting the writ of attachment in this case, I submit, in conclusion, whether, after all the various matters involved in this litigation have been repeatedly before the supreme court, of the United States, and as often determined against the claims set up by the persons and corporations of Iowa, who are parties to suits in the federal courts, it is not the duty of those parties, at least as to the cases in the courts of the United States. to yield obedience as good citizens, to the orders of the final arbiter of the law.

NOTE. The decisions of the supreme court of Iowa on the question of these municipal bonds are numerous. and many of them are elaborately argued. Dubuque County v. Dubuque & P. R. Co., 4 G. Greene, 1; State v. Bissell, Id. 328; Clapp v. Cedar County, 5 Iowa, 15; Ring v. Johnson County, 6 Iowa, 265; McMillen v. Boyles, Id. 304; Games v. Robb, 8 Iowa, 193; Stokes v. Scott County, 10 Iowa, 166; Whittaker v. Johnson County, Id. 161; State v. County of Wapello, 13 Iowa, 389; Myers v. Johnson County, 14 Iowa, 47; McMillan v. Boyles, Id. 107; Rock v. Wallace, Id. 593; Smith v. Henry County, 15 Iowa, 385; Ten Eyck v. Mayor of Keokuk, Id. 486: Chamberlain v. City of Burlington, 19 Iowa, 395. And later, in the case of McClure v. Owen, 26 Iowa. 243, the supreme court of Iowa review the decisions. and deny the binding authority of the decisions of the United States supreme court on the questions involved. That mandamus is the proper remedy to enforce the judgment. see U. S. v. Treasurer of Muscatine County [Case No. 16,538]. The doctrine that an injunction from a state court is inoperative to restrain the acts commanded by a mandamus from a federal court is approved in Riggs v. Johnson County, 6 Wall. [73 U. S.] 166; U. S. v. Keokuk, Id. 514.

The decision of the supreme court of the United States that bonds issued while the state courts held that they were legally issued and valid can-

2 [From 9 Int. Rev. Rec. 25.]

not be afterwards invalidated by a change in the decisions by the same courts, was rendered at the December term, 1865, and is reported Thompson v. Lee County, 3 Wall. [70 U. S.] 327.

The federal courts will not necessarily follow the decisions of the state courts in questions of common law (City of Chicago v. Robbins, 2 Black [67 U. S.] 418; Williamson v. Berry, 8 How. [49 U. S.] 495; Lane v. Vick, 3 How. [44 U. S.] 464); nor in questions of commercial law (Swift v. Tyson, 16 Pet. [41 U. S.] 1; Carpenter v. Providence-Washington Ins. Co., Id. 495; Neves v. Scott, 13 How. [54 U. S.] 268; Foxcroft v. Mallet, 4 How. [45 U. S.] 353). The distinction is also made that the federal courts will not so follow state constructions as to render invalid contracts entered into with citizens of other states (Rowan v. Runnels, 5 How. [46 U. S.] 134); or where a different construction had become the basis of contracts (Pease v. Peck, 18 How. [59 U. S.] 595). In the case of Talcott v. Pine Grove [Case No. 13, 735], Emmons, J., gives an exceedingly elaborate review of the authorities in both the state and federal courts on several of the questions involved in this case. The supreme court, in the case of Olcott v. Fond du Lac County, 16 Wall. [83 U. S.] 678, which was a suit upon county bonds, has ruled that a decision of the state supreme court that the bonds were invalid, the act under which they were issued being unconstitutional, was not binding upon the federal courts; that if a contract is valid under the constitution and laws of a state as expounded by its judicial tribunals at the time, no subsequent action by the legislature or judiciary can invalidate it; and that bonds issued in aid of a railroad, when such purposes were construed to be for the public good, and to warrant the imposition of taxes, a subsequent decision that no taxes can be imposed for such purposes cannot affect the rights of bona fide holders.

Consult also Leffingwell v. Warren, 2 Black [67 U. S.] 599; Cohens v. State of Virginia, 6 Wheat. [19 U. S.] 264; Carroll v. Carroll, 16 How. [57 U. S.] 275; Mitchell v. Burlington, 4 Wall. [71 U. S.] 270; City v. Lamson, 9 Wall. [76 U. S.] 477.